# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

**TRI-STATE HOSPITAL SUPPLY CORPORATION,**

　　　　　　**Plaintiff,**

　　v.

**UNITED STATES OF AMERICA,**

　　　　　　**Defendant.**

---

**Civil Action 00-01463  (HHK)**

## MEMORANDUM OPINION

Tri-State Hospital Supply Corporation ("Tri-State") brings this action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq.,* alleging that the United States Customs Service ("Customs") and the Department of Justice ("DOJ") (collectively "Government") subjected it to a malicious prosecution and abuse of process in connection with their six-year investigation of Tri-State for its alleged violations of United States customs laws and the imposition of civil penalties on Tri-State for such alleged violations. Tri-State seeks to recover $3.2 million in damages, the attorneys' fees it incurred defending itself against the Government's actions.

Before the court is the Government's motion for summary judgment. Upon consideration of the motion, the opposition thereto, and the summary-judgment record, the court concludes that the motion must be granted.

# I.  BACKGROUND

**A.    Criminal Investigation**

Tri-State is a privately-owned corporation in Howell, Michigan, that sells hospital supplies throughout the United States.  In the early 1980s, it began importing surgical instruments from suppliers in Pakistan.  The surgical instruments entered the United States at the Port of Detroit, where Tri-State often engaged the services of a licensed customs broker, LEP International, Inc., to complete the required customs entry forms.  The forms require the importer to list "the price actually paid or payable" for goods entering the country.  19 U.S.C. § 1401a(b)(1).  Although Tri-State paid the invoice price for the imported goods, it subsequently received "rebates" from its Pakistani suppliers.  On the customs entry forms, however, Tri-State declared the price that was reflected on the invoices accompanying the imported supplies.  As a result, it overstated the price it ultimately paid for the supplies after taking into account the subsequent rebates.  The supplies were not subject to duty, however.  Thus, the United States lost no revenue as a result of the inflated invoices.

In early 1994, Tri-State became the subject of civil and criminal investigations for allegedly submitting false invoices to Customs.  Customs officials in Washington, D.C., had received information regarding currency transactions by three individuals in Virginia which appeared to have been structured to avoid currency reporting requirements, and which may have indicated money laundering was taking place.  These individuals had transmitted money to

various other individuals in Pakistan as well as to four U.S. importers of surgical instruments, including Tri-State.[1]

On March 28, 1994, Customs officials executed a search warrant at Tri-State's Michigan headquarters, seizing evidence relating to the value of surgical instruments imported from Pakistan, and subsequently sought the indictment of Tri-State and two of its executives for criminal customs fraud.  Both the United States Attorney for the Eastern District of Michigan and the United States Attorney for the Eastern District of Virginia declined to prosecute.

**B.      Customs Proceeding**

United States law requires importers to file true and accurate invoices with Customs.  *See* 19 U.S.C. §§ 1481, 1485.  The Government may seek to collect civil penalties for fraudulent, grossly negligent or negligent violations of the duty to file accurate invoices under 19 U.S.C. § 1592, which is the principal enforcement mechanism of the customs laws for false invoicing. The relevant portions of § 1592 provide:

> (1) General rule
>
> Without regard to whether the United States is or may be deprived of all or a portion of any lawful duty thereby, no person, by fraud, gross negligence, or negligence--
> (A) may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of--
> (i) any document or electronically transmitted data or information, written or oral statement, or act which is material and false, or

---

[1]      The three individuals — Shakeel Ahmad, Zamir Ahmed, and Mian Taquir Ahmed — as well as two principals of another importer of surgical instruments, were indicted in October 1994 on charges of conspiracy, money laundering, currency structuring, customs fraud, false statements, and tax violations.  The district court dismissed the money laundering charges, and the Fourth Circuit later reversed the structuring and false statement convictions, but the convictions for customs fraud and on the other counts were affirmed.  *United States v. Ismail*, 97 F.3d 50, 64 (4th Cir. 1996).

(ii) any omission which is material, or
(B) may aid or abet any other person to violate subparagraph (A).

19 U.S.C.§ 1592(a) (1995).[2]

Following the decisions of the United States Attorneys not to prosecute Tri-State

criminally, Customs began to issue a series of civil penalty notices against Tri-State for

violations of customs laws, alleging that Tri-State had fraudulently overstated the prices it had

paid for imported surgical instruments and that it had engaged in an international money

laundering scheme.  Customs officials issued Tri-State a pre-penalty notice in October 1995,

indicating that Customs was contemplating the issuance of a claim for $9,484,597 in civil

penalties for alleged overstatement of values on 203 items.  In February 1996, Customs issued an

amended pre-penalty notice seeking $5.8 million in penalties.  A penalty notice for $5.8 million

was then issued in March 1996.  An amended penalty notice was issued in April 1996, again

imposing the $5.8 million penalty.

In June 1996, Tri-State's counsel met with Customs officials in Washington, D.C., to

present Tri-State's position regarding the penalties.  Tri-State's counsel argued that Tri-State had

not engaged in a fraudulent scheme and reasonably had relied on its custom broker's advice in

reporting the prices of the surgical supplies.  Customs was not swayed by Tri-State's explanation

and, in July 1996, issued a final penalty notice advising Tri-State that it was responsible for

$3,187,719 in penalties for failing to disclose the rebates and true value of the objects imported.

---

[2]     Section 1592 was amended in 1996, substituting "lawful duty, tax, or fee" for
"lawful duty."  Miscellaneous Trade and Technical Corrections Act, Pub. L. No, 104-295,
§ 3(a)(4)(A), 110 Stat. 3515, 3531 (1996).

When Tri-State refused to pay the penalty, Customs referred the matter to the DOJ for the collection of civil penalties.

On April 28, 1997,  DOJ brought suit against Tri-State, on behalf of Customs, in the U.S. Court of International Trade ("CIT").  At trial, Tri-State moved for judgment as a matter of law on two of the three counts, and DOJ dismissed its fraud claim against Tri-State.  The CIT subsequently granted Tri-State's motion for judgment as a matter of law on the gross negligence count, finding "[no] evidence which rises to the level of willful or wanton conduct."  Pl.'s Ex. 1 at 755 (CIT Trial Tr.).  At the close of trial, a verdict was returned in Tri-State's favor on the sole remaining negligence count.

## C.      Tri-State's Action against United States

Tri-State filed the instant action in June 2000, alleging that: (1) the Government engaged in malicious prosecution because it lacked probable cause to issue penalty notices against Tri-State or to sue Tri-State for collection of those penalties in the CIT, and that Customs officials knowingly violated their own regulations by seeking to impose civil penalties (Count I ); and (2) the Government engaged in abuse of process in connection with the penalty notices and enforcement trial (Count II ).

Believing that it was jurisdictionally barred from awarding the relief sought by Tri-State because the FTCA does not expressly waive the sovereign immunity of the United States from liability for attorneys' fees, this court dismissed this action.  *Tri-State Hosp. Supply Corp. v. United States*, 142 F. Supp. 2d 93, 103 (D.D.C. 2001) (*Tri-State I*).  On appeal, the D.C. Circuit reversed, holding that attorneys' fees *qua* damages were recoverable against the United States for abuse of process and malicious prosecution if "the law of the place" where the tort occurred so

provides, *Tri-State Hospital Supply Corp. v. United States*, 341 F.3d 571, 572 (D.C. Cir. 2003) (*Tri-State II*), and remanded this action for resolution of Tri-State's claims on their merits.

## II.  ANALYSIS

### A.    Choice of Law under the FTCA

The FTCA provides a limited waiver of the government's sovereign immunity, granting federal district courts jurisdiction over a certain category of claims for which the United States has rendered itself liable.  *Fed. Deposit Ins. Co. v. Meyer*, 510 U.S. 471, 477 (1994).  To be actionable under the FTCA, a claim must be:

> (1) against the United States, (2) for money damages, . . .  (3) for injury or loss of property, or personal injury or death (4) caused by the negligent or wrongful act or omission of any employee of the Government (5) while acting within the scope of his office or employment, (6) under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).  Section 1346's reference to the " 'law of the place' means law of the State — the source of substantive liability under the FTCA."  *Meyer*, 510 U.S. at 478.  Thus, state law establishes the elements of a particular tort cause of action that is otherwise actionable under the FTCA.  *Tri-State II*, 341 F.3d at 576.

### 1.    Applicable Conflicts Law

A threshold question here, then, is which "place" provides the law that governs Tri-State's FTCA claim, a question that must be answered by determining which jurisdiction's conflicts law applies.  The Government contends that the conflicts law of Michigan should apply while Tri-State contends that the applicable conflicts law is that of the District of Columbia.

To determine which law should be applied, the court must first decide "where the act or omission occurred," and then apply that jurisdiction's "whole law," including its conflicts law, to the facts of this case. *Richards v. United States*, 369 U.S. 1, 10–11 (1962); *Hitchcock v. United States*, 665 F.2d 354, 359 (D.C. Cir. 1981). A prerequisite to deciding where the act or omission occurred is determining "which was the *relevant* act or omission." *Hitchcock*, 665 F.2d at 359 (emphasis added). In *Hitchcock*, the plaintiffs, a career Foreign Service Officer who had been assigned a post in Buenos Aires Argentina, and his wife, filed suit against the United States under the FTCA after the wife  became paralyzed following the administration of a rabies immunization vaccine to her by a government nurse in Virginia. In determining the place where the relevant act occurred, the court reasoned that the failure by the nurse to warn of the risks of the vaccine was due to low supervision and direction, which was ultimately attributable to the failure of State Department officials in the District of Columbia to properly develop the protocol for the administration of the vaccine. *Id.* at 359–60. Thus, "[a]lthough the final negligent act occurred in Virginia," the court concluded, the "locus of the negligent acts and omissions is thus established as Washington, D.C." *Ibid.*

The court's decision in *Raflo v. United States*, 157 F. Supp. 2d 1, 4 (D.D.C. 2001), concerned the misdiagnosis of an U.S. Army veteran's wife, in Army hospitals in both Virginia and D.C. The court observed that, in *Hitchcock*, the court treated the Department of State as the primary government actor. In *Raflo*, the court found that the "the relevant acts and/or omissions of alleged negligent implementation and maintenance of adequate procedures and alleged negligent hiring, training and supervision of the physicians and staff, were performed by the

United States Army officials" in Virginia.  *Id*. at 9–10.  Thus, the applicable conflicts law was that of Virginia.

The parties agree that *Hitchcock* provides the relevant standard but disagree as to which are the relevant acts or omissions.  The Government contends that the relevant investigatory acts or omissions occurred in Michigan: (1) Tri-State was headquartered in Michigan throughout the relevant period; (2) the search warrant executed on Tri-State in Michigan in 1994 was requested by Customs agents in Detroit and was authorized by the U.S. District Court for the Eastern District of Michigan; (3) Customs agents in Detroit allegedly failed to fully investigate or respond to Tri-State's defenses; and (4) the Detroit Port Director signed and issued four pre-penalty and penalty notices in Michigan.

For its part, Tri-State contends that the "primary government actor here is the U.S. Customs Service, which directed and controlled the actions of its agents and employees in Michigan, and which is headquartered in Washington, D.C."  Pl.'s Opp'n at 5.  Tri-State asserts that the most relevant acts giving rise to its claims — the authorization to issue the pre-penalty and penalty notices, the correspondence and the meetings concerning the enforcement action, and the imposition of the monetary penalty — all occurred in the District of Columbia.  The initial penalties contemplated were greater than $5 million, and as such, they had to be approved by Customs Headquarters in Washington, D.C.  The substantive meetings between Tri-State and Customs concerning the penalties took place in Washington, D.C.  For example, Tri-State officials met with Customs officials in the District, in June 1996 to make a formal presentation as to why no penalty should be imposed.  Tri-State's arguments were rejected on July 31, 1996, by a Customs Decision issued by Chief Customs Penalty Officer Charles Ressin, who is located in

Washington, D.C.  The penalty action was subsequently referred to the DOJ, also located in the District, for prosecution.

The Government counters that the relevant acts on which Tri-State relies were all committed by Customs *attorneys*, and thus they are not "investigative or law enforcement officers of the United States Government" under the malicious prosecution and abuse of process provision of the FTCA.  *See* 28 U.S.C. 2680(h) (defining "investigative or law enforcement officer" as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law").  Unfortunately for the Government, however, this court has already determined that such officials are considered "investigative or law enforcement officers" for purposes of § 2680(h).  *Tri-State I*, 142 F. Supp. 2d at 99 (holding that Customs officials are investigative officers because they are authorized to seize evidence if there is "reasonable cause to believe that a person has violated [a federal statute]." 19 C.F.R. § 162.75(a)).  The Government chose not to challenge this conclusion on appeal.  *Tri-State II*, 341 F.3d at 573 n. 3 (noting that this ruling was not before the D.C. Circuit as the Government chose not to cross-appeal).

Accordingly, the court concludes that Tri-State has the better of the argument and that the majority of the relevant acts or omissions giving rise to Tri-State's claims had their locus in Washington, D.C.  Thus, the applicable conflicts law is that of the District of Columbia.

## 2.  **Which Jurisdiction's Substantive Law Applies**?

Under the conflicts law of the District of Columbia, the court must first determine if there is a conflict between the laws of the relevant jurisdictions.  *Duncan v. G.E.W., Inc.*, 526 A.2d

1358, 1363 (D.C. 1987); *Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d 876, 882 (D.C. Cir. 1985). Only if such a conflict exists must the court then determine which jurisdiction has the "more substantial interest" in the resolution of the issues.  *See Greycoat Hanover F St. Ltd. P'ship v. Liberty Mut. Ins. Co.*, 657 A.2d 764, 767 (D.C. 1995); *Eli Lilly*, 764 F.2d at 882.

A conflict exists between the law of the District of Columbia and Michigan pertinent to a malicious prosecution cause of action.  Under both Michigan and D.C. law, in order to prevail on a malicious prosecution claim, the plaintiff must prove special injury, that is, "some injury which would not necessarily occur in all suits prosecuted for similar causes of action." *Kauffman v. Sherman*, 426 N.W.2d 819, 824 (Mich. App. 1988); *see also Weisman v. Middleton*, 390 A.2d 996, 1000 (D.C. 1978) (same).  Under the law of the District of Columbia, however, being forced to defend multiple proceedings may constitute special injury, *see Weisman*, 390 A.2d at 1000, while Michigan apparently has not yet considered the matter.  Because the substantive laws of the two jurisdictions are in conflict, the court must proceed to determine which law to apply under District of Columbia choice of law rules.

In determining which jurisdiction's law to apply, the District of Columbia has adopted the "governmental interests" analysis, under which the court evaluates the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review.  *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995).  The court also considers the four factors enumerated in the Restatement (Second) of Conflict of Laws § 145:

    (a) the place where the injury occurred;
    (b) the place where the conduct causing the injury occurred;

10

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and

(d) the place where the relationship is centered.

*Coleman*, 667 A.2d at 816.

The Government offers no argument on the question of choice of law analysis other than a bald assertion that the "factors favor the application of Michigan law." Def.'s Mot. at 11–12 n.9. For its part, Tri-State offers a self-serving and circular argument that because the District of Columbia recognizes recovery for defending multiple actions — the very claim that Tri-State makes here — it must therefore serve the District's interests to apply such law.

Consideration of the pertinent factors favor the application of the law of the District of Columbia. The forum "where the defendant's conduct occurs has the dominant interest in regulating it and in determining whether it is tortious in character." *Biscoe v. Arlington County*, 738 F.2d 1352, 1361 (D.C. Cir. 1984) (internal quotation marks omitted) (applying D.C. choice of law analysis). Although the injury alleged here could be said to have occurred in multiple locations, the primary actions causing the alleged injury are an outgrowth of decisions made by persons located within the District of Columbia. Moreover, the parties' relationship is centered in the District. And finally, because this case is premised upon the actions of Customs officials, it would appear that the District of Columbia — the home of the Customs Service — would have as great, if not a greater, interest than Michigan in applying its law to Tri-State's claims. Consequently, District of Columbia law governs Tri-State's claims.

**B.      Motion for Summary Judgment**

Having determined that the law of the District of Columbia governs Tri-State's claims,

the court now turns to the Government's contention that it is entitled to summary judgment.  The

standards to be applied are familiar.  Under Federal Rule of Civil Procedure 56, summary

judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on

file and affidavits show that there is no genuine issue of material fact in dispute and that the

moving party is entitled to judgment as a matter of law.  Material facts are those "that might

affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986).  In considering a motion for summary judgment, the "evidence of the non-

movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

But the non-moving party's opposition must consist of more than mere unsupported allegations

or denials and must be supported by affidavits or other competent evidence setting forth specific

facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex Corp. v.

Catrett,* 477 U.S. 317 (1986).  The non-moving party is "required to provide evidence that would

permit a reasonable jury to find" in its favor. *Laningham v. United States Navy*, 813 F.2d 1236,

1242 (D.C. Cir. 1987).  If the evidence is "merely colorable" or "not significantly probative,"

summary judgment may be granted. *Anderson,* 477 U.S. at 249–50.

**1.      Malicious Prosecution**

In order to prevail on a malicious prosecution claim, a plaintiff must establish: (1) that the

underlying suit terminated in her favor; (2) malice on the part of the defendant; (3) lack of

probable cause for the underlying suit; and (4) special injury occasioned by plaintiff as the result

of the original action.  *See Joeckel v. Disabled Am. Veterans*, 793 A.2d 1279, 1282 (D.C. 2002).

The  Government asserts that it is entitled to judgment as a matter of law because the undisputed

facts show that (1) Tri-State cannot demonstrate that it suffered "special injury" and (2) the

Government had probable cause to pursue its investigation and civil action against Tri-State.[3]
The Government's assertions have merit.

### i.    *Special Injury*

The special injury required to establish malicious prosecution has been defined as an

arrest, seizure of property, or "injury which would not necessarily result from suits to recover for

like causes of action."  *Joeckel*, 793 A.2d at 1282 (internal quotation marks omitted).  Ordinarily,

incurring substantial expense in defending against a lawsuit does not rise to the level of special

injury.  *Id.*[4]  However, as has been explained, under D.C. law being subjected to successive

baseless actions regarding the same underlying dispute may constitute special injury.  *Soffos v.*

*Eaton*, 152 F.2d 682, 685 (D.C. Cir. 1945); *Davis v. Boyle Bros.*, 73 A.2d 517, 520 (D.C. 1950)

(concluding that special injury was demonstrated where a department store had admitted its error

in pursuing a collection action, promised it would stop its collection efforts, yet continued to

pursue a default judgment).

_____

Although the Government frames its argument mostly around Michigan law — which the
court has determined is not applicable here —its position has merit under D.C. law.

[4]        That is not to say that attorneys' fees and the cost of litigation are not recoverable
as *damages* for malicious prosecution, which they are.  Rather, such expenses are not sufficient
to plead special injury.  *See Penwag Prop. Co., Inc. v. Landau*, 388 A.2d 1265, 1266 (N.J. 1978)
("Counsel fees and costs in defending the action maliciously brought may be an element of
damage in a successful malicious prosecution, but do not in themselves constitute a special
grievance necessary to make out the cause of action.").

Tri-State contends that Customs' four separate pre-penalty and penalty notices, in addition to the suit brought against it in the CIT, were separate successive proceedings that were outside the ordinary course of action necessary for investigation of invoice entries by Customs officials.  And, because they were pursued without probable cause, Tri-State asserts that the burden of defending against them constitutes a special injury. Tri-State's position cannot be sustained.

The process for issuing pre-penalty and penalty notices prior to the institution of collection proceedings under 19 U.S.C. § 1592 has ben described as follows:

> A two-stage administrative procedure is contemplated by section 1592 in connection with penalty assessment. First, if a Customs officer has reasonable cause to believe a violation of the section 1592(a) prohibition has occurred, he is directed by the statute to issue a prepenalty notice. *See* 19 U.S.C. § 1592(b)(1)(A) . . . .  Then, after due consideration of any representations the alleged violator may have made in response to the notice, the officer is directed to arrive at a determination as to the penalty or fine. In the event the officer finds that there was a violation of section 1592(a), he must issue a penalty notice, in writing, to the party concerned. The alleged violator must, according to the statute, be given a reasonable opportunity in which to file a petition for remission or mitigation. After these representations are heard and evaluated, the officer arrives at a final determination.

*United States v. Ross*, 6 Ct. Int'l Trade 270, 272 n.3 (Ct. Int'l Trade 1983).  If the alleged violator fails to pay the penalty assessed, the government is authorized to seek recovery in the CIT.  19 U.S.C. § 1592(e).

During the administrative stages of a penalty assessment action, "an importer is under no obligation to pay an assessed penalty.  Such an obligation only arises after the CIT conducts a de novo review of all issues in a government initiated enforcement proceeding and determines whether a penalty is due and the amount of any such penalty." *Nippon Miniature Bearing Corp.*

14

*v. Weise*, 230 F.3d 1131, 1137 (9th Cir. 2000); *see also* 19 U.S.C. § 1592(e) (providing for de

novo review by the CIT of all issues in a proceeding commenced by the United States for the

recovery of any monetary penalty claimed under § 1592); *Playhouse Import & Export, Inc. v.*

*United States*, 18 Ct. Int'l. Tr. 41, 45 (Ct. Int'l Tr. 1994) (noting that, prior to a government

initiated enforcement proceeding, an importer does not suffer a cognizable injury as a result of an

administrative penalty assessment determination).  The penalty assessment phase is provided as

an opportunity to mitigate penalties.

It is apparent that the penalty assessment and collection proceedings to which Tri-State

was subjected, properly considered and analyzed, were not "successive" actions but were

separate stages of one proceeding conducted in the manner prescribed by statute and applicable

regulations.  Morever, there is no evidence that any unusual or exceptional procedures were

employed in this case, nor anything to suggest that the proceedings were longer or more onerous

than otherwise would have been necessary for penalty investigation and assessment.  In sum,

there is no merit to Tri-State's contention that it was subjected to successive proceedings that

were outside the ordinary course of action necessary for investigation of invoice entries.

### ii.    *Probable Cause*

Tri-State's argument that the proceedings against it were lacking in probable cause also is

without merit.  The Government points out that the principals of another surgical supply

company — Falcon Instruments  —  were convicted of customs violations involving so-called

"rebates"  under circumstances that were similar to those extant here.  *See Ismail*, 97 F.3d at 63

(concluding use of "rebates" to inflate invoice prices on customs forms violated 18 U.S.C. § 542

and upholding conviction of Falcon principals for customs violations).  The statute at issue in

that case — § 542 — is the criminal analog of § 1592, the civil customs statute Tri-State was

accused of violating.  *See United States v. Holmquist*, 36 F.3d 154, 160 (1st Cir. 1994)

(observing that § 1592 is the "civil analog" of  § 542).

Tri-State responds by pointing out that:

- The scheme in *Ismail* is distinguishable because, unlike Falcon, Tri-State was not

   overvaluing its imports in an effort to overstate its inventory and improperly decrease the

   company's tax liability, *see* Pl.'s Ex. 87 at 3 (Stipulation of Facts)..

- Tri-State relied on the advice of a customs broker in preparing its invoices.  *See* Pl.'s Ex.

   4 at 1 (Welter Affidavit) (John Welter, Tri-State's treasurer, stated that "sometime in the

   approximate 1984 to 1986 time frame," he consulted a representative of LEP, a Customs

   broker, who advised him that it would be "acceptable" to report the higher price as

   indicated on the invoice since there was no duty involved).[5]

- The alleged falsity of the invoices was not "material," as required for a violation, because

   the Government was never deprived of any revenue because (1) the merchandise was

   duty-free; and (2) any falsity in value would only inure to the Government's benefit

   because Tri-State reported a higher price.

- The Government did not have probable cause to seek penalties on 24 entries which

   occurred from April to October, 1990, because the parties stipulated to a statute of

_____

[5]        Customs brokers are licensed by the Customs Service, which encourages use of
their "expert" advice in filling out customs forms.  *See* Pl.'s Ex. 89 at 1 (U.S. Customs Service
"Reasonable Care" Checklist, 1998).

limitations that excluded any violations prior to October 1990.  Pl.'s Ex. 59 (Tri-State Waiver, October 1995).

- Customs officials knew of the alleged violations as early as 1991— and not in 1993, as the Government contends — and thus the statue of limitations on the fraud counts ran out in 1996.[6]  Customs Special Agent Jennifer Gibbs testified that the Government first learned of the imports at issue "probably in late 1991 . . .  as far as [she] could remember."  Pl.'s Ex. 10 at 49–50 (Gibbs Dep.).  Gibbs executed a declaration in October 1998 recanting her previous testimony and stating that Customs did not have any information about Tri-State's alleged overvaluation of imports until 1993.  Pl.'s Ex. 65 ¶ 8 (Gibbs Decl.).  She had been asked by a Customs attorney to clarify the date when the Government learned of the alleged violations because some of the claims would be barred by the statute of limitations based on her initial deposition, Pl.'s Ex. 1 at 284–85 (Trial Tr.).

The Government counters by asserting that:

- The *Ismail* scheme was the same as the Tri-State scheme in that it violated the same customs law, regardless of whether it also had a tax benefit to any of its participants.

---

[6]     The Government may only seek penalties for violations within five years of the alleged violation or, in the case of fraud, within five years of their discovery.  19 U.S.C. § 1621(1).  Under Customs regulations in place at the time, a penalty should be cancelled if the Government determines by "clear and convincing evidence that the statute of limitations would be available as a defense."  19 C.F.R. Pt. 171 App. B(D)(6) (1995). (The regulation regarding the statute of limitations was amended in 2000 to eliminate this provision.  *See* Guidelines for the Imposition and Mitigation of Penalties for Violations of 19 U.S.C. 1592, 65 Fed. Reg. 39,087 (June 23, 2000) (codified at 7 C.F.R. Pt. 171 App. B(D)(6))).

- Reliance on a broker is not a complete defense to an invoicing violation. *See* Pl.'s Ex. 89 at 1–6 (Customs "Reasonable Care" Checklist, 1998) (explaining that consultation of a Customs broker is a sign of exercising "reasonable care" among dozens of other factors).

- A false invoice statement of price is, as a matter of law, a material false statement within the meaning of § 1592. *United States v. Modes, Inc.*, 16 Ct. Int'l Trade 879, 884–85 (Ct. Int'l Trade 1992). That an item was duty-free does not relieve an importer of the obligation to file true and accurate invoices — § 1592 specifically provides for penalties "[w]ithout regard to whether the United States is or may be deprived of all or a portion of any lawful duty." *See also United States v. Daewoo Int'l Corp.*, 12 Ct. Int'l Trade 889, 895 (Ct. Int'l Trade 1988), *vac'd on other grounds*, 13 Ct. Int'l Trade 76 ("The statements involved here were material. It is irrelevant that the United States may not be deprived of any lawful duties because defendants overstated the value of the merchandise.").

- The Government dismissed the negligence and gross-negligence counts based on the 24 entries prior to the CIT action. The fraud claims based on the 24 entries were dismissed by stipulation and thus were not terminated in Tri-State's favor, as required to support a claim of malicious prosecution.

- Agent Gibbs misstatement in her initial deposition was a simple error and her timely correction indicates the Government had no intent to deceive. Tri-State has pointed to no other evidence supporting the proposition that the Government was investigating Tri-State's invoicing in 1991.[7]

---

[7]     Although the investigation into the money-structuring transactions began in 1991, the contemporaneous documentary evidence indicates that law enforcement authorities did not

Even when viewed in a light most favorable to Tri-State, the undisputed evidence supports the Government's position that it proceeded with probable cause.  Tri-State fails to appreciate that in assessing probable cause *vel non* the court looks to the totality of the circumstances.  Here, considering the totality of the circumstances, the Government, quite simply and at the very least, had probable cause to believe that Tri-State had submitted material and false invoices, invoices that did not reveal rebates and thus overstated the prices Tri-State paid for surgical instruments it imported.

2.    **Abuse of Process**

Under District of Columbia law, abuse of process occurs when "process has been used to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be required to do."  *Jacobson v. Thrifty Paper Boxes, Inc.*, 230 A.2d 710, 711 (D.C. 1967) (internal quotation marks omitted); *see also Moore v. United States*, 213 F.3d 705, 712 (D.C. Cir. 2000).  In order to establish a claim for abuse of process, one must prove "an ulterior motive," and that "there has been a perversion of the judicial process and achievement of some end not contemplated in the regular prosecution of the charge."  *Morowitz v. Marvel*, 423 A.2d 196, 198

---

develop sufficient information regarding Tri-State until approximately 1993, when officials learned that there were four companies receiving the suspicious payments from Pakistan.  *See* Pl.'s Ex. 11 at 3 (Customs Report of Investigation March 21, 1995) (stating that interviews in 1993 with companies receiving funds (including Tri-State) were "inconclusive").  Tri-State's records were not seized until March 1994, when the search warrant was executed.

(D.C. 1980); *see also Scott v. District of Columbia*, 101 F.3d 748, 755 (D.C. Cir. 1997)

(observing that there must be perversion of process in addition to ulterior motive).[8]

The Government contends that Tri-State's abuse of process claim must fail because (1)

the pre-penalty and penalty notices are not judicial processes; (2) the CIT action does not

constitute an abuse of process; and (3) an error by the Government in an interrogatory response

does not constitute abuse of process.

### i.     Penalty Notices

It is not clear whether, under District of Columbia law, an administrative proceeding can

be considered a "process" for purposes of an abuse of process claim.  *Compare Hall v. Field*

*Enterprises, Inc.*, 94 A.2d 479, 481 (D.C. 1953) (concluding that claim for abuse of process lies

where plaintiff is sued over contract he never signed because suit was "a perversion of court

processes")*, with Lewis v. Lhu*, 696 F. Supp. 723, 728 (D.D.C. 1988) (treating administrative

licensing proceeding as "process" for purposes of abuse of process claim).  District of Columbia

courts have never explicitly held that an administrative proceeding could give rise to a claim for

abuse of process, nor have they held that such claims are reserved only for judicial process and

not other adjudicative processes.

---

[8]     The Government contends that the court should apply the law of New York and
Michigan, since those are the locations of the "processes" which Tri-State alleges were abused.
As explained above, however, the relevant decisions leading to the alleged injuries here occurred
in the District of Columbia. Thus, proper choice-of-law analysis leads the court to conclude that
District of Columbia law should apply as the interests of the District of Columbia  are best served
by the  application of its law.

Even assuming that such a claim would lie in an abuse of administrative process, however, Tri-State's claim fails for another reason: Tri-State has failed to allege any facts supporting the conclusion that Customs officials had an ulterior motive in pursuing the penalty process or that they sought to use the process for a reason other than its ordinary purpose.  To be sure, Tri-State contends that Customs officials were improperly motivated by their desire to avoid embarrassment or professional penalization for failing to pursue this case, an allegation which it claims is supported by the fact that Customs officials had committed substantial resources over several years to the investigation, which was apparently the biggest case in the Washington financial investigations group for two years.  Pl.'s Ex. 85 at 31 (Delli Colli Dep.).

The motivation to successfully complete a lengthy investigation is not a "perversion" of the penalty process, as Tri-State would have the court conclude.  The penalty process is intended to investigate and impose penalties for customs violations; even taking the evidence in the light most favorable to Tri-State, there is no evidence that Customs officials were motivated by anything other than the punishment of a customs violation.  That they were later unable to prevail in the end does not, in and of itself, render their conduct abusive.  To conclude otherwise would be to hold that every losing party in a lawsuit is liable for abuse of process.  Viewing the facts in the light most favorable to the plaintiff, as the court must, the court nonetheless concludes that Tri-State cannot establish its abuse of process claims because it has put forth no evidence of ulterior motive or perversion of the penalty process.

### ii.      CIT Action

The Government contends that the decision to enforce the penalty in the CIT was made by DOJ attorneys who are not law enforcement officers, and thus their actions cannot form the basis of an abuse of process claim.  As the Government correctly asserts, it is well-established that the discretionary decisions of DOJ attorneys may not serve as the basis for a malicious prosecution and abuse of process claim against the United States.  *See Moore*, 213 F.3d at 709–10 (affirming dismissal of claims against federal prosecutor).  As this court has already concluded in this case, none of the actions of DOJ attorneys may serve as the basis of an abuse of process claim.  *Tri-State I*, 142 F. Supp. 2d at 98 (noting DOJ attorneys' exercise of discretion may not form basis of suit for malicious prosecution or abuse of process).[9]  The DOJ attorneys independently reviewed the case file and made their own decision to take the matter to trial. Def.'s Mot. Ex. 45 (Cohen Decl.).  The court concludes that as a matter of law, the conduct of the DOJ attorneys in the CIT action may not form the basis of an abuse of process claim.

### iii.     Interrogatory Response

Finally, Tri-State contends that an erroneous response to an interrogatory regarding Tri-State's history of customs violations raises a genuine issue of fact as to the Government's motivations in the CIT action.  In January 1998, the Government responded to Tri-State's first set of interrogatories and erroneously stated that Tri-State had violated customs laws at the port of El Paso, Texas.  It is undisputed that a paralegal in the El Paso Customs office had queried an

---

[9]      The conduct of the DOJ attorneys here is also protected under the discretionary function exception.  *Cf. Sloan v. U.S. Dep't of Housing and Urban Dev.*, 236 F.3d 756, 760 (D.C. Cir. 2001) ("The decision to initiate a prosecution has long been regarded as a classic discretionary function.").

electronic database and found a listing for a penalty of less than $100 for an entity listed as Tri-State.  Def.'s Ex. 48 at 56–57 (McElvain Dep.).  DOJ attorneys later discovered that the violation pertained to a different company also known as Tri-State.  *Id.* at 84–86.  In June 1998, DOJ officials told Tri-State that it had "received information" that the El Paso violation was not committed by Tri-State and that they would provide Tri-State with a stipulation to that effect.  Pl.'s Ex. 73 at 2 (DOJ Letter, June 15, 1998).  Although a prior violation of customs law may serve as the basis for aggravated penalties, Joel McElvain, an attorney with the DOJ, testified that "Customs did not rely on the possibility of a prior violation in determining the penalty amount."  Def.'s Ex. 48 at 48–49 (McElvain Dep.).

Contrary to Tri-State's assertion, there is no material question as to the facts surrounding the erroneous interrogatory, nor is there is any hint that the erroneous report of a minimal violation was the result of an improper motivation on the party of the Customs officials.  Moreover, neither the paralegal who performed the database inquiry nor the DOJ attorneys who prepared the interrogatory are investigative or law enforcement officers.  As already explained above, their conduct may not form the basis of an abuse of process claim.

### 3.    Discretionary Function Exception

As an alternative ground for its assertion that it is entitled to summary judgment, the Government contends that the actions of the Customs officials are protected by the discretionary functions exception to the FTCA and therefore may not form the basis of plaintiff's claims.

The FTCA waives the United States' immunity with respect to claims for injury caused by the "negligent or wrongful act or omission" of a Government employee.  28 U.S.C.

§ 1346(b)(1).  The FTCA's waiver of sovereign immunity is limited in part by the so-called

"discretionary function exception," *id.* § 2680, which provides that there can be no recovery for

any claim:

> based upon an act or omission of an employee of the Government, exercising due
> care, in the execution of a statute or regulation, whether or not such statute or
> regulation be valid, or based upon the exercise or performance or the failure to
> exercise or perform a discretionary function or duty on the part of a federal agency
> or an employee of the Government, whether or not the discretion involved be
> abused.

*Id.* § 2680(a).  In determining whether the discretionary function exception applies, the court

must apply a two-prong test.  First, the court must determine whether a "federal statute,

regulation, or policy specifically prescribes a course of action for an employee to follow."

*Berkovitz v. United States*, 486 U.S. 531, 536 (1988).  If such a "binding directive" exists, then

" 'the employee has no rightful option but to adhere to the directive.' "  *Loughlin v. United*

*States*, 393 F.3d 155, 163 (D.C. Cir. 2004) (quoting *Berkovitz*, 486 U.S. at 536). Failure to abide

by such directives opens the United States to suit under the FTCA.  *Id.*  If no specific directive

exists, the court must apply the second prong and determine whether the challenged discretionary

acts of a government employee "are of the nature and quality that Congress intended to shield

from liability."  *Murphy v. United States*, 121 F. Supp. 2d 21, 26 (D.D.C. 2000) (internal

quotation marks omitted).

Tri-State asserts that Customs officials had an obligation under Customs regulations to

investigate Tri-State's claim that it relied on LEP's advice in filling out the forms.  The

Government contends, however, that the applicable regulations create no such requirement, and

that the actions of Customs officials were protected by the discretionary function exception.

24

The regulation provides that the appropriate customs official "shall cancel a claim for monetary penalty whenever it is determined that an essential element of the violation has not been established by the available evidence."  19 C.F.R. 171 App. B(D)(5) (1995).  The court has previously held that Customs officials were not protected by the discretionary function exception "[a]ssuming that Customs officials failed to comply with these mandatory regulations."  *Tri-State I*, 142 F. Supp. 2d at 101.  Upon review of the full record, however, it appears that Customs officials did comply with the regulations.  The applicable regulation requires that Customs officials take into account all available evidence but leaves to their discretion the manner in which they should determine whether an essential element of a violation is established.  When presented with Tri-State's contention that it relied on LEP's advice, Customs agents visited LEP to interview its employees and served an administrative summons seeking further information.  Def.'s Ex. 21 at 1–2 (Report of Investigation June 21, 1994); Def.'s Statement of Material Facts ¶ 37.  LEP responded to the summons that there was "no evidence of any correspondence . . . or other documents related to rebates or information/advise[sic] given to Tri-State."  *Id.* ¶ 38.  LEP also provided Customs agents with the names of 14 employees who might have been assigned to Tri-State's account.  Customs agent Bethel and his supervisors determined it would not be feasible to interview all of these employees in order to establish whether Tri-State had an affirmative defense.

Courts have consistently held that the investigatory choices at issue here are the type that Congress intended to protect with the discretionary function exception.  Investigatory decisions by administrative agencies, similar to those of prosecutors, "must at a minimum be afforded a presumption that they too are discretionary in nature."  *Murphy*, 121 F. Supp. 2d at 26.  The

25

decision by Customs officials to issue a penalty in the face of Tri-State's vague allegations of advice from its broker was discretionary and was not in violation of a binding directive.  Thus, such actions were protected by the discretionary function exception.  So too were Port Director John Batt's decisions to issue penalty notices.

The Government also contends that Charles Ressin, Chief of the Penalties Branch of the Customs Service, is protected by the discretionary function exception from the charge that his failure to grant Tri-State relief was an act of malicious prosecution.  Pursuant to the relevant statute, a Customs official,

> if he finds that such fine, penalty, or forfeiture was incurred without willful negligence or without any intention on the part of the petitioner to defraud the revenue or to violate the law, or finds the existence of such mitigating circumstances as to justify the remission or mitigation of such fine, penalty, or forfeiture, *may* remit or mitigate the same upon such terms and conditions as he deems reasonable and just, or order discontinuance of any prosecution relating thereto.

19 U.S.C. § 1618 (emphasis added).  By its very terms, this statute is permissive and thus by definition is discretionary.  *See United States v. Von Neumann*, 474 U.S. 242, 244 (1986) (describing power under § 1618 as " the discretionary authority to mitigate or remit the penalty or forfeiture"); *Tourus Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 735 (D.C. Cir. 2001) (internal quotation marks omitted) (observing that decision to mitigate or remit under § 1618 is "committed to agency discretion by law").  Thus, as a matter of law, the actions of the Chief Penalties Officer under this statute are also protected by the discretionary function exception.

26

## III.  CONCLUSION

For the foregoing reasons, the court concludes that the Government's motion for summary judgment must be granted.  An appropriate order accompanies this memorandum opinion docketed this same day.

Henry H. Kennedy, Jr.
United States District Judge

Dated: July  6, 2007